United States Court of Appeals,

Eleventh Circuit.

Nos. 96-2788, 96-3773 and 96-6947.

J. Daniel KIMEL, Jr., Ralph C. Dougherty, Burton H. Altman, Robert W. Beard, Valdall K. Brock, et al., Plaintiffs-Appellees,

Doris C. Baker, et al., Plaintiffs,

v.

STATE OF FLORIDA BOARD OF REGENTS, Defendant-Appellant.

Wellington N. Dickson, a.k.a. Duke, Plaintiff-Appellee,

v.

Florida Department of Corrections, Jackson County, Defendant-Appellant,

Jackson Correctional Institution, Jim Folsom, and James Edward Childs, a.k.a. J.E. Childs, Major, Defendants.

Roderick MacPherson, Marvin Narz, Plaintiffs-Appellants,

v.

University of Montevallo, Defendant-Appellee,

National Employment Lawyers Association, Amicus,

United States of America, Intervenor-Appellant.

April 30, 1998.

Appeals from the United States District Court for the Northern District of Florida. (No. 95-40194-MP), Maurice M. Paul, Judge and No. 5:96-CV-207-RH), Robert L. Hinkle, Judge.

Appeal from the United States District Court for the Northern District of Alabama.

Before HATCHETT, Chief Judge, and EDMONDSON and COX, Circuit Judges.

EDMONDSON, Circuit Judge:[1]

Three cases presenting the same or similar issues of Eleventh Amendment immunity were consolidated and are addressed in this appeal. In all three cases, the States, or their agencies, submitted motions to dismiss based on Eleventh Amendment immunity. The issues in this appeal are whether Congress abrogated States' Eleventh Amendment immunity for suits under the Age Discrimination in Employment Act ("ADEA") and under the Americans with Disabilities Act ("ADA").[2]

Two district courts, the Northern District of Florida, Tallahassee Division, in *State of Florida, Board of Regents v. Kimel* ("*Kimel* ") and the Northern District of Florida, Panama City Division, in *Florida Department of Corrections v. Dickson* ("*Dickson* "), held that Congress effectively abrogated States' sovereign immunity with its enactment of the ADEA (and for *Dickson* the ADA) and denied the motions to dismiss. But, the Northern District of Alabama in *MacPherson, Narz v. University of Montevallo* ("*MacPherson* ") granted the State's motion to dismiss on Eleventh Amendment grounds. We agree with the Northern District of Alabama that suits by private parties against States in federal court for ADEA violations are prohibited by the Eleventh Amendment.

---

[1]Judge Edmondson announces the judgment for the Court in this case. Judge Cox concurs in the result in Part I of Judge Edmondson's opinion but decides the issue on a different basis. Chief Judge Hatchett dissents in Part I. Chief Judge Hatchett concurs in the result in Part II of Judge Edmondson's opinion but also writes separately on the issue. Judge Cox dissents in Part II of the opinion.

[2]Only case number 96-3773, *Florida Dep't of Corrections v. Dickson,* presents the Eleventh Amendment issue for the ADA.

The cases were appealed for us to decide whether Congress abrogated sovereign immunity when it enacted the relevant statutes.[3] Because this appeal presents only questions of law, not dependent upon factual determinations, the facts of each Plaintiff's claim will not be discussed.

*Discussion*

A district court's order denying or granting a motion to dismiss a complaint against a State based on the Eleventh Amendment's grant of sovereign immunity is reviewed by this court *de novo*. *See Seminole Tribe of Florida v. Florida,* 11 F.3d 1016, 1021 (11th Cir.1994), *aff'd,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. This provision not only prohibits suits against States in federal court by citizens of other States, but also prohibits suits brought against a State in federal court by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).[4]

In *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court recently considered the issue of when Congress can properly abrogate

---

[3]Plaintiff Wellington Dickson claims we lacked jurisdiction to hear the State of Florida's appeal of the denial of its motion to dismiss. This appeal is properly before this Court under the collateral order doctrine. Like qualified immunity, a decision on this issue after trial would defeat the State's right to be immune from trial. The Eleventh Amendment provides the States with immunity from suit, not just immunity from damages. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 688, 121 L.Ed.2d 605 (1993).

[4]The Eleventh Amendment only prohibits suits by private parties against unconsenting States in *federal court. See Maine v. Thiboutot,* 448 U.S. 1, 9 n. 7, 100 S.Ct. 2502, 2507 n. 7, 65 L.Ed.2d 555 (1980) (Eleventh Amendment principles are not applicable to suits in state court.).

States' Eleventh Amendment immunity. The Court's decision in *Seminole* overruled *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which held that acts taken by Congress pursuant to the Commerce Clause could, if sufficiently clear, abrogate Eleventh Amendment immunity. In *Seminole,* the Court specifically held that Congress had no authority to abrogate State sovereign immunity under the Eleventh Amendment when Congress acted pursuant to the Commerce Clause; the power to abrogate only exists under Section 5 of the Fourteenth Amendment.[5] In addition, the Court set out precisely what Congress must do to abrogate the States' immunity.

Two requirements must be satisfied before Eleventh Amendment immunity can be successfully abrogated by Congress. *Seminole,* 517 U.S. at 54, 116 S.Ct. at 1123. *First,* Congress must have intended to abrogate that immunity by providing "a clear legislative statement" of its intent—"making its intention unmistakably clear in the language of the statute."[6] *Id.* (citing *Blatchford v. Native Village of Noatak and Circle Village,* 111 S.Ct. 2578, 2584 [1991], and *Dellmuth v. Muth,* 491 U.S. 223, 224-25, 109 S.Ct. 2397, 2399-2400 [1989] ). *Second,* Congress must have attempted to abrogate this immunity under proper constitutional authority. In other

---

[5]The enforcement provision of the Fourteenth Amendment provides:

> Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV, § 5.

[6]For me, "unmistakably" strongly intensifies the implications of "clear;" and I take that message to heart.

4

words, Congress must have enacted the statute at issue using its Fourteenth Amendment, Section 5, enforcement powers. *See Seminole,* 517 U.S. at 62-63, 116 S.Ct. at 1127-28.[7]

*I. Age Discrimination in Employment Act of 1967*

Although I believe good reason exists to doubt that the ADEA was (or could have been properly) enacted pursuant to the Fourteenth Amendment, I will not decide that question today;[8] questions of constitutional power should be decided only as a last resort. Instead, I focus on the ADEA's words and rest my decision on the lack of unmistakably clear legislative intent.

In searching the ADEA for an unequivocal statement of intent to abrogate, courts look only to the language of the statute itself. *Dellmuth,* 491 U.S. at 228, 109 S.Ct. at 2401 ("[E]vidence of congressional intent must be both *unequivocal and textual* ... [l]egislative history generally will be

---

[7]The Eleventh Amendment can also be abrogated by a State's waiver—actual consent—but no one claims that a waiver occurred in these cases.

[8]This doubt is suggested by a variety of considerations, to state briefly a few: (1) where the Supreme Court has held that Congress enacted a statute pursuant to its Commerce Clause powers, we must be cautious about deciding that Congress could have acted pursuant to a different power. *See League of United Latin Amer. Citizens, Council No. 4434 v. Clements,* 986 F.2d 728, 758-59 (5th Cir.1993) ("Although there was some argument that Congress acted pursuant to its enforcement powers under the Fourteenth Amendment in passing the ADEA, the [Supreme] Court in *Gregory[ v. Ashcroft]* ultimately concluded that Congress had acted *only* pursuant to its Commerce Clause powers.") (emphasis added); (2) where two statutes are enacted together in the same bill, like the ADEA and the Fair Labor Standards Act ("FLSA"), it seems reasonable that Congress enacted the bill—all portions of it—pursuant to the same authority. *See* 120 Cong. Rec. 7337 (1974) (FLSA enacted *only* pursuant to Congress's Commerce Clause power, especially considering that the FLSA [like the ADEA] initially only applied to private employers, who are not the proper subjects of Fourteenth Amendment enforcement); (3) when addressing a characteristic, such as age, that is not the kind of immutable characteristic as race, gender, or national origin, it is questionable that Congress could lawfully be acting to enforce the Fourteenth Amendment. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 310, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (Age does not rise to the level of a suspect or quasi-suspect class: it is a stage of life through which all persons go.).

irrelevant" because if the intent is clear in the language of the statute, "recourse to legislative history will be unnecessary.") (emphasis added).  A court's guess about Congress's political will and subjective intentions—past, present, or future—is without consequence;  only the statute and its language are to be considered.  As directed by the Supreme Court, I do not go beyond the text of the ADEA in deciding whether it contains the requisite, unmistakably clear statement of intent to abrogate.  *Id.*

This requirement—that the intent to abrogate be found in an unmistakably clear statement in the language of the statute—necessitates a high level of clarity by Congress.  But, as the Supreme Court has observed, such a requirement of Congress is not too high when considering the important interests protected by the Eleventh Amendment.  The Eleventh Amendment recognizes that States, as a matter of constitutional law, are special entities—still possessing attributes of sovereignty.  The Amendment strikes a balance between the federal government and the States.  To alter that balance, Congress must be unmistakably clear in its intent.  *See Dellmuth v. Muth,* 491 U.S. at 226, 109 S.Ct. at 2400.

No unequivocal expression of an intent to abrogate immunity is unmistakably clear in the ADEA. No reference to the Eleventh Amendment or to States' sovereign immunity is included.  Nor is there, in one place, a plain, declaratory statement that States can be sued by individuals in federal court.  To me, an intent on the part of Congress to abrogate the States' constitutional right to immunity is not sufficiently clear to be effective under Eleventh Amendment jurisprudence.[9]

---

[9]The ADEA presents a different situation from the one in *Seminole,* where the Court held that Congress clearly expressed its intent to abrogate immunity when Congress said, among other things, that jurisdiction was vested in "*[t]he United States district courts ...* over any cause of action ... arising from the failure of a *State* to enter into negotiations ... or to conduct such negotiations in good faith...."  Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(7)(A)(I)

In one section, 29 U.S.C. § 630, the ADEA defines employers to include States. In a different section, 29 U.S.C. § 626(b), which never mentions employers much less mentions States as defendants, the ADEA separately provides for enforcement by means of suits for legal or equitable relief in courts of competent jurisdiction. This statutory structure does not provide the clarity needed to abrogate States' constitutional right to sovereign immunity. For abrogation to be unmistakably clear, it should not first be necessary to fit together various sections of the statute to create an expression from which one might infer an intent to abrogate. Although we make no definite rule about it, the need to construe one section with another, by its very nature, hints that no *unmistakable* or *unequivocal* declaration is present. More important, when we do construe the various ADEA sections together, abrogation never becomes "as clear as is the summer's sun."[10]

---

(emphasis added). This section, along with the remedial scheme available to a tribe that files suit under section 2710, leaves no doubt "as to the identity of the defendant in an action under [this section]." *Seminole,* 517 U.S. at 56, 116 S.Ct. at 1124.

> Unlike the ADEA, the Indian Gaming Regulatory Act at issue in *Seminole* creates a scheme of federal regulation of Indian-tribe gambling. Other than the suits authorized against States for their lack of good faith negotiations for Tribal-State compacts, the only enforcement provision of the Act is a civil fine that can be imposed by the Commission created by the Act. Thus, the only suits available to an entity other than the Commission are available to Indian tribes. And the only entities that the tribes can sue under the Act are States: no other means of enforcement are established.

> The single-mindedness of the Act adds much clarity to its words. The ADEA, on the other hand, is more complicated. As a general proposition, it doubtlessly permits suits against a wide range of employers (public and private) and for various remedies (legal and equitable) and in different forums (state and federal courts). But this fact sheds little light on the narrow question of suits by individuals against States in federal court.

[10]For background, see William Shakespeare, King Henry the Fifth act 1, sc. 2 (speech of Canterbury outlining Henry's claim to the French throne).

"A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *See Seminole,* 517 U.S. at 54, 116 S.Ct. at 1123 (citing *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 244, 105 S.Ct. 3142, 3149, 87 L.Ed.2d 171 (1985)). "[T]hat Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses to that claim." *Blatchford,* 501 U.S. at 786 n. 4, 111 S.Ct. at 2585 n. 4.

Still, Plaintiffs argue, and all three district courts seemed to agree, that Congress's amendments to the ADEA in 1974—adding States, their agencies, and political subdivisions to the definition of "employer" (along with the original portions of the ADEA providing that the statute may be enforced in courts of competent jurisdiction)—represents the unmistakably clear legislative statement required to abrogate the Eleventh Amendment. This view (which is opposed by the State in *Dickson* ) seems to clash with the Supreme Court's precedents.

In *Employees of the Dep't of Public Health and Welfare v. Missouri,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Supreme Court held that the Fair Labor Standards Act ("FLSA") did not provide a sufficiently clear statement of intent to abrogate the Eleventh Amendment. As initially enacted, the FLSA (like the ADEA) did not apply at all to States. In 1966, the FLSA was amended to include certain State agencies in the definition of employer. This amendment, the Court held, did *not* provide the clear statement of intent to abrogate immunity, despite the provisions allowing suits in courts of "competent jurisdiction" against employers who violated the FLSA. *Id.* at 281, 93 S.Ct. at 1617. "The history and tradition of the Eleventh Amendment indicate that by reason of that barrier a federal court is not competent to render judgment against a nonconsenting State." *Id.* Like the ADEA, there was no dispute that the FLSA applied to the State agencies set out

8

in the FLSA; the dispute was only about what kinds of enforcement were available when dealing with States as defendant-employers.[11]

In a later decision, *Dellmuth v. Muth,* the Supreme Court held that the Education of the Handicapped Act (EHA) did *not* abrogate Eleventh Amendment immunity despite provisions allowing suit in federal district court and many provisions referring to the States as parties in suits of enforcement. *See Dellmuth,* 491 U.S. at 226-27, 109 S.Ct. at 2400-02. That the pertinent statute (like the ADEA) never mentioned either "the Eleventh Amendment or the States' sovereign immunity" was given weight. *Id.* at 230, 109 S.Ct. at 2402. Abrogation was not sufficiently clear. *Id.*

To include the States as employers under the ADEA, as in the FLSA, does not show an intent that the States be sued by private citizens in federal court—the kind of suit prohibited under the Eleventh Amendment.[12] The ADEA is enforceable against the States, despite sovereign

---

[11]The ADEA's 29 U.S.C. § 626(b) refers to sections of a different Act, the FLSA, particularly to some of the FLSA enforcement provisions at issue in *Employees.* This statutory structure is hardly straightforward. In 1974, after *Employees,* Congress amended the FLSA. Those amendments changed the FLSA's enforcement provision to provide that suits could be brought against "employers (including a public agency)" in "any Federal or State court of competent jurisdiction." 29 U.S.C. § 216. (The FLSA as amended is similar to 29 U.S.C. § 626[c][1] in the ADEA itself.) Still, a federal court lacks "competent jurisdiction" if the Eleventh Amendment prohibits the suits against the State. *Employees,* 411 U.S. at 281, 93 S.Ct. at 1617. So, making it specific that suits can be brought in federal court does not make it more clear that suits against States by private parties in federal court are in order. Other, private employers could be the intended defendants in such suits. And equitable relief might be available against state officials in federal courts. *See Edelman v. Jordan,* 415 U.S. 651, 663-64, 94 S.Ct. 1347, 1356-57, 39 L.Ed.2d 662 (1974).

[12]Plaintiffs' argument in this appeal mistakenly frames this issue as one of the constitutionality of the relevant statutes. The statutes' basic constitutionality is not in jeopardy. This appeal only addresses whether the ADEA and ADA can be enforced through suits by private parties in federal court against offending States.

immunity, through forms of relief other than direct suits by citizens in federal court.[13] Congress may have had these other forms of enforcement in mind when it amended the statute to include States as employers. Thus, the general application of the law to the States does not make the requisite clear statement that Congress also intended the ADEA to abrogate the Eleventh Amendment specifically.

I do not dispute that some provisions of the ADEA make States look like possible defendants in suits alleging violations of the ADEA. I accept that these provisions could support an "inference that the States were intended to be subject to damages actions for violations of the [ADEA]." *Dellmuth,* 491 U.S. at 230, 109 S.Ct. at 2402. But, as the Supreme Court stressed in *Dellmuth,* a permissible inference is not "the unequivocal declaration" that is required to show Congress's intent to exercise its powers of abrogation. *Id.*[14]

---

[13]For examples of other methods of ensuring the States' compliance with federal law, see *Seminole,* 517 U.S. at 71 n. 14, 116 S.Ct. at 1131 n. 14.

[14]Some circuits have held that Congress did clearly express its intent to abrogate States' immunity in the ADEA. *See, e.g., Hurd v. Pittsburg State Univ.,* 109 F.3d 1540 (10th Cir.1997); *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690 (3d Cir.1996); *Davidson v. Board of Governors of State Colleges and Univs.,* 920 F.2d 441 (7th Cir.1990); *Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694 (1st Cir.1983). I respect their views. These courts determined that the amendments adding States to the definition of "employer," read in connection with enforcement provisions permitting suits against violators of the ADEA, made it sufficiently clear that Congress intended to abrogate Eleventh Amendment immunity: Compare 29 U.S.C. § 623 (describing what conduct is unlawful) with 626(b), ( c) (permitting civil suits "in any court of competent jurisdiction" for legal or equitable relief as may be appropriate to effectuate the purposes of the Act) and 630 (including States in the definition of "employer"). Although, to me, these courts are drawing a permissible inference from the statute, I cannot agree that the ADEA's language includes an *unequivocal* declaration of abrogation of States' immunity as required by the Constitution and the Supreme Court. It is just not "unmistakably clear" to me. *See generally Humenansky v. Board of Regents of the Univ. of Minnesota,* 958 F.Supp. 439 (D.Minn.1997) (also concluding the ADEA lacks the necessary "unequivocal declaration" of intent to abrogate).

I conclude that nothing in the ADEA indicates a truly clear intent by Congress to abrogate Eleventh Amendment immunity and, thus, States are entitled to immunity from suits by private citizens in federal court under the ADEA.

*II. Americans With Disabilities Act*

In sharp contrast to the ADEA, the ADA does include a clear statement of intent to abrogate Eleventh Amendment immunity: "A State shall not be immune under the eleventh amendment ..." 42 U.S.C. § 12202.[15]

Thus, the only argument that Eleventh Amendment immunity still exists is that the ADA was not enacted pursuant to the Fourteenth Amendment. We are not persuaded by this argument.

Unlike the ADEA, it is plain that Congress was invoking its Fourteenth Amendment enforcement powers when it enacted the ADA. *See* 42 U.S.C. § 12101(b) ("It is the purpose of this chapter ... (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment...."). Congress specifically found that "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment." 42 U.S.C. § 12101(a)(7).[16] We accept Congress's analysis

---

[15]I do not say that certain magic words must be used to abrogate immunity. I accept that Congress could unmistakably signal abrogation of immunity in a variety of ways, and we write no general rules today. *See* 42 U.S.C. § 2000e-5(f)(1) (where Title VII speaks of suits by aggrieved persons against "a government, governmental agency, or political subdivision" while discussing suits in federal district courts) and *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976) (concluding that Title VII abrogates Eleventh Amendment immunity). But when considering abrogation in both the ADEA and the ADA, I cannot help but see the clarity with which Congress addressed sovereign immunity in the ADA. Comparing the language of these two statutes further spotlights the ambiguous nature of the ADEA's treatment of Eleventh Amendment immunity.

[16]By the way, an express invocation of Fourteenth Amendment powers is not present in the ADEA. Nor did Congress make findings in the ADEA that persons of a particular age constitute

11

of the situation addressed by the ADA and agree with the courts that have addressed the issue: the ADA was properly enacted under Congress's Fourteenth Amendment enforcement powers. *See, e.g., Amos v. Maryland Dep't of Pub. Safety and Correctional Servs.,* 126 F.3d 589, 603 (4th Cir.1997).[17]

*Conclusion*

The Eleventh Amendment is an important part of the Constitution. It stands for the constitutional principle that State sovereign immunity limits the federal courts' jurisdiction under Article III. As such, Congress must make an unmistakably clear statement of its intent before a federal court can accept that States have been stripped of their constitutionally granted sovereign immunity. For me, the ADEA contains no unequivocally clear statement of such intent. The ADA does. And the ADA was enacted under the authority of the Fourteenth Amendment.

For the reasons stated in our combined opinions, we hold that the ADEA does not abrogate States' Eleventh Amendment immunity but that the ADA does do so. Therefore, in *Kimel,* we REVERSE and REMAND for dismissal. In *Dickson,* we AFFIRM in part and REVERSE in part and REMAND for further proceedings. In *MacPherson,* we AFFIRM the district court's decision.

HATCHETT, Chief Judge, concurring in judgment in part, dissenting in part:

I would hold that Congress effectively abrogated the states' sovereign immunity under the Eleventh Amendment of the United States Constitution in both the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Americans with Disabilities Act (ADA),

---

a discrete and insular minority.

[17]In *Kimel,* the State presents one further issue: That should we determine the ADEA suit cannot be maintained against the State, we should remand with instructions to the district court to dismiss the supplemental state claim under the Florida Human Rights Act. That is the proper decision, and that claim is remanded to the district court with instructions that it be dismissed. *See Eubanks v. Gerwen,* 40 F.3d 1157, 1161-62 (11th Cir.1994).

12

42 U.S.C. §§ 12101-12213. I therefore respectfully dissent from Part I of the Discussion in Judge Edmondson's opinion, holding that because states are entitled to sovereign immunity under the Eleventh Amendment, private citizens are precluded from bringing lawsuits against such entities in federal court under the ADEA.[1] I concur, however, in the result of Part II of Judge Edmondson's Discussion, concluding that the states are not entitled to Eleventh Amendment immunity from federal lawsuits under the ADA. I disagree with Judge Cox's analysis in its entirety and feel compelled to address, in particular, his assertion that the ADEA and the ADA are not "valid enforcement" legislation pursuant to Congress's power under Section 5 of the Fourteenth Amendment.[2]

Congress may exercise its power to abrogate the states' Eleventh Amendment immunity if (1) it "has "unequivocally expresse[d] its intent to abrogate the immunity' "; and (2) it "has acted "pursuant to a valid exercise of power.' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252, 266 (1996) (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425, 88 L.Ed.2d 371 (1985)) (alteration in original). Congress must make its intent "unmistakably clear in the language of the statute." *Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122, 134 L.Ed.2d at 266 (quoting *Dellmuth v. Muth,* 491 U.S. 223, 228, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989)). If the court finds that Congress clearly expressed its intent to abrogate the

---

[1]For the sake of brevity, I will use the term "states" to refer to states and their agencies and instrumentalities.

[2]Because Judge Cox provides the determining vote that states are entitled to sovereign immunity under the ADEA—albeit for a reason different from that of Judge Edmondson—my opinion with respect to the court's ADEA analysis is a dissent. With regard to the ADA, however, I merely write separately to uphold the applicability of that statute to the states, as did Judge Edmondson.

states' immunity, the next inquiry is whether Congress enacted the legislation in question "pursuant to a constitutional provision granting [it] the power to abrogate[.]" *Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. at 1124, 134 L.Ed.2d at 268.[3]  A statute is "appropriate legislation" to enforce the Equal Protection Clause of the Fourteenth Amendment if it "may be regarded as an enactment to enforce the Equal Protection Clause, [if] it is "plainly adapted to that end' and [if] it is not prohibited by but is consistent with "the letter and spirit of the constitution.' "  *Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.) (quoting *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)) (alterations in original), *petition for cert. filed,* 66 U.S.L.W. 3308 (U.S. Oct. 20, 1997) (No. 97-686).

## I. Congress's Intent to Abrogate the States' Immunity

*A. The ADEA*

The ADEA makes it unlawful for an "employer" "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age[.]"  29 U.S.C. § 623(a)(1) (1994).  In 1974, Congress amended the definition of "employer" to include "a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State," and deleted text explicitly excluding such entities from that definition.  29 U.S.C. §

---

[3]In *Seminole Tribe,* the Supreme Court overruled *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and held that Congress has no authority to abrogate the states' sovereign immunity when acting pursuant to the Commerce Clause, but can abrogate their immunity under Section 5 of the Fourteenth Amendment.  517 U.S. at 58, 63, 116 S.Ct. at 1125, 1128, 134 L.Ed.2d at 268, 273.

630(b)(2) & note (1994).[4] The ADEA explicitly provides that employers who violate the statute are subject to liability for legal and equitable relief. *See* 29 U.S.C. § 626(b) (1994) ("In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter...."); 29 U.S.C. § 626(c)(1) (1994).

I agree with the parties in *Kimel*—including the Florida Board of Regents—and with virtually every other court that has addressed the question, including all three district courts in the underlying cases, that Congress made an "unmistakably clear" statement of its intent to abrogate the states' sovereign immunity in the ADEA. *See Hurd v. Pittsburg State Univ.,* 109 F.3d 1540, 1544 (10th Cir.1997); *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 695 (3d Cir.1996); *Davidson v. Board of Governors of State Colleges & Univs. for W. Ill. Univ.,* 920 F.2d 441, 443 (7th Cir.1990). "Unless Congress had said in so many words that it was abrogating the states' sovereign immunity in age discrimination cases—and that degree of explicitness is not required—it could not have made its desire to override the states' sovereign immunity clearer." *Davidson,* 920 F.2d at 443 (internal citations omitted); *see also* Edmondson, J., at 2398 n. 15 ("I do not say that certain magic words must be used to abrogate immunity. I accept that Congress could unmistakably signal abrogation of immunity in a variety of ways, and we write no general rules today."). As the Third Circuit persuasively pointed out, "[t]he statute simply leaves no room to dispute whether states and state agencies are included among the class of potential defendants when sued under the ADEA for their actions as "employers.' " *Blanciak,* 77 F.3d at 695; *see also Seminole Tribe,* 517 U.S. at 57, 116 S.Ct. at 1124, 134 L.Ed.2d at 266-67 (relying on the references to the "State" in the text of the

---

[4]As a result, "employee" under the ADEA includes those persons who work for states and their agencies. *See* 29 U.S.C. § 630(f) (1994) (with some exceptions, "[t]he term "employee' means an individual employed by any employer....").

15

statute in question to conclude that such references "[made] it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit").[5]

I take issue with my colleague's reliance on the facts that "[n]o reference to the Eleventh Amendment or to States' sovereign immunity is included [in the ADEA,]" "[n]or is there, in one place, a plain, declaratory statement that States can be sued by individuals in federal court." Edmondson, J., at 2395. Although Judge Edmondson states that we do not require Congress to use any "magic words" to abrogate effectively the states' sovereign immunity, and that Congress may "unmistakably signal abrogation of immunity in a variety of ways," I believe that his opinion, in essence, is requiring exactly that. Edmondson, J., at 2398 n. 15. If Congress has not sufficiently expressed its intent to abrogate the states' immunity through including "States" in the definition of "employer" in the ADEA, after this decision, I cannot imagine in what other "variety of ways"

---

[5]I disagree that *Employees of the Dep't of Public Health & Welfare v. Department of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), concluding that Congress did not clearly express its intent to abrogate the states' immunity in enacting the 1966 amendments to the Fair Labor Standards Act (FLSA), calls into question Congress's intent to abrogate the states' immunity under the ADEA. In 1974, Congress specifically amended the FLSA to address the concerns of the *Employees* Court and to authorize lawsuits against the states in federal court. *See* Mills v. Maine, 118 F.3d 37, 42 (1st Cir.1997) (stating that "we agree with the other courts of appeals that have examined the FLSA's provisions and have concluded that the Act contains the necessary clear statement of congressional intent to abrogate state sovereign immunity"); *Hurd,* 109 F.3d at 1544 n. 3; Reich v. New York, 3 F.3d 581, 590, 591 (2d Cir.1993) (stating that "Congress amended [the FLSA] with the intent that states and their political subdivisions would thereafter be subject to suit in federal court for violations of the FLSA[,]" and finding that "Congress has made its intent to abrogate the states' sovereign immunity abundantly clear in the language of the FLSA, as amended in 1974 and 1985"), *cert. denied,* 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994), *overruled on other grounds,* Close v. New York, 125 F.3d 31, 38 (2d Cir.1997) ("[W]e can no longer justify congressional abrogation under the Interstate Commerce Clause, and to the extent that *Reich* permits such abrogation, we hold *Reich* is no longer good law."); Hale v. Arizona, 993 F.2d 1387, 1391 (9th Cir.) (*en banc* ) (stating that Congress clearly intended to abrogate the states' sovereign immunity in the 1974 amendments to the FLSA), *cert. denied,* 510 U.S. 946, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993).

16

Congress can signal the abrogation of the states' immunity, other than through the use of "magic words." The Court in *Seminole Tribe* did not require that Congress use any talismanic language to express its intent to abrogate, and could easily have done so. As I do not believe that *Seminole Tribe* requires Congress to use any particular words to express effectively its intent to abrogate the states' immunity, and because I believe that Congress's intent is clear in the language of the ADEA, I conclude that the first criterion of *Seminole Tribe* is satisfied. *See EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) ("[T]here is no doubt what the intent of Congress was:  to extend the application of the ADEA to the States.");  *Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 2404, 115 L.Ed.2d 410 (1991) ("[The] ADEA plainly covers all state employees except those excluded by one of the exceptions.");  *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 2669, 49 L.Ed.2d 614 (1976) (concluding that Congress's designation of states as parties in Title VII was sufficient to abrogate the states' immunity).

*B. The ADA*

The ADA presents an easier case under *Seminole Tribe*'s "clear statement" standard, as both Judges Edmondson and Cox agree. *See* Edmondson, J., at 2398 n. 15;  Cox, J., at 2412-13.  Within the statute's text, Congress explicitly provided:

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter.  In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202 (1994).  Accordingly, I find that Congress "unequivocally expressed" its intent to abrogate the states' sovereign immunity in section 12202 of the ADA. *See Autio v. AFSCME, Local 3139,* No. 97-3145 (8th Cir. Apr.9, 1998);  *Coolbaugh v. Louisiana,* 136 F.3d 430, 433 (5th

17

Cir.1998) (finding Congress's intent to abrogate the states' immunity under the ADA "patently clear"); *Clark,* 123 F.3d at 1269-70.[6]

## II. Congress's Power to Abrogate the States' Immunity

In addition to clearly expressing its intent, Congress also must have acted pursuant to its authority under Section 5 of the Fourteenth Amendment to abrogate successfully the states' Eleventh Amendment immunity. *See Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. at 1124, 134 L.Ed.2d at 268. Judge Cox asserts that, regardless of whether Congress clearly expressed its intent to abrogate the states' immunity from lawsuits in federal court under both the ADEA and the ADA, Congress lacks the constitutional authority to do so under these statutes, relying on the Supreme Court's recent decision in *City of Boerne v. Flores,* --- U.S. ----, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In *Boerne,* the Supreme Court held that Congress exceeded its Section 5 authority in enacting the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, through which Congress sought to reinstate a previous, more stringent standard of review for free exercise of religion claims.[7] The Court found that Congress was not *enforcing* rights under the Fourteenth

---

[6]I must emphasize, however, that I do not conclude, or imply, that Congress is *required* to use any "magic words" to express effectively its intent to abrogate the states' immunity. I conclude only that Congress's intent under the ADA is clear.

[7]In *Employment Division, Dep't of Human Resources v. Smith,* 494 U.S. 872, 883-87, 110 S.Ct. 1595, 1602-04, 108 L.Ed.2d 876 (1990), the Supreme Court declined to apply the balancing test for analyzing free exercise claims set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and held that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2161, 138 L.Ed.2d at 635. Congress then enacted the RFRA, seeking "to restore the compelling interest test as set forth in *Sherbert* [,] ... and to guarantee its application in all cases where free exercise of religion is substantially burdened...." 42 U.S.C. § 2000bb(b)(1) (1994). Thus, "[the] RFRA prohibit[ed] "[g]overnment' from "substantially burden[ing]' a person's exercise of religion even if the burden result[ed] from a rule of general applicability unless the government [could] demonstrate the burden "(1) [was] in furtherance of a

Amendment, which it undeniably has the power to do, but was attempting to *create* rights that the Constitution did not guarantee. *See Boerne,* --- U.S. at ----, 117 S.Ct. at 2170, 138 L.Ed.2d at 646. In other words, Congress had impermissibly enacted "substantive" legislation. Judge Cox states that "*Boerne* and the Voting Rights Act cases teach us [that] [o]nly by respecting Supreme Court interpretations of the Fourteenth Amendment can Congress avoid impermissibly interpreting the Amendment itself." Cox, J., at 2414. I interpret his analysis to limit, in an unallowable manner, the power of Congress and thus, disagree.

*A. The ADEA*

Judge Cox asserts that the ADEA was not a proper exercise of Congress's Section 5 power under the *Boerne* analysis for two main reasons. First, he alleges that the statute confers more extensive rights to individuals than does the Equal Protection Clause of the Fourteenth Amendment. In essence, Judge Cox alleges that the ADEA puts "mandatory retirement ages" and "mandatory age limits" to a much more rigorous test than the Equal Protection Clause requires. Cox, J., at 2415-16. In addition, Judge Cox asserts that "Congress did not enact the ADEA as a proportional response to any widespread violation of the elderly's constitutional rights[,]" because, among other reasons, the legislative history accompanying the 1974 amendment to the ADEA did not mention the Constitution or constitutional violations. Cox, J., at 2415, 2416-17.

To the contrary, like many other circuit courts, I conclude that the ADEA falls squarely within the enforcement power that Section 5 of the Fourteenth Amendment confers on Congress. *See Hurd,* 109 F.3d at 1545-46; *Ramirez v. Puerto Rico Fire* Serv., 715 F.2d 694, 699-700 (1st

---

compelling governmental interest; and (2)[was] the least restrictive means of furthering that compelling governmental interest.' " *Boerne,* --- U.S. at ----, 117 S.Ct. at 2162, 138 L.Ed.2d at 636 (quoting 42 U.S.C. § 2000bb-1).

19

Cir.1983); *EEOC v. Elrod,* 674 F.2d 601, 608-09 (7th Cir.1982); *Arritt v. Grisell,* 567 F.2d 1267, 1270-71 (4th Cir.1977). Congress enacted the ADEA to remedy and prevent what it found to be a pervasive problem of arbitrary discrimination against older workers. Such protection is at the core of the Fourteenth Amendment's guarantee of equal protection under the law. Even though Congress arguably has gone further in proscribing government employment practices that discriminate on the basis of age than have the courts in adjudicating claims under the Fourteenth Amendment, this merely reflects the differing roles of Congress and the courts.

*1. Congress enacted the ADEA to "enforce" rights under the Equal Protection Clause of the Fourteenth Amendment.*

In *Boerne,* Congress legislated a constitutional standard of review for the judiciary. Contrary to Judge Cox's assertions, I do not find this to be the case under the ADEA. In general, the Equal Protection Clause proscribes states from treating similarly situated persons within their jurisdictions differently and assures that governments will differentiate between their citizens only upon reasonable grounds that have a relationship to the desired goals. *See, e.g., Romer v. Evans,* 517 U.S. 620, 630-32, 116 S.Ct. 1620, 1627-28, 134 L.Ed.2d 855, 865-67 (1996); *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992); *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). Although age is not a "suspect" or quasi-suspect classification deserving of close judicial scrutiny under the Equal Protection Clause, the Fourteenth Amendment's equal protection guarantees are not limited solely to members of a few protected groups.[8] *See, e.g.,*

---

[8]Under the Equal Protection Clause, arbitrary state action can burden the rights of older individuals on the basis of age if the action passes the rational basis test, *i.e.,* it is rationally

20

*Cleburne,* 473 U.S. at 447, 105 S.Ct. at 3258 ("[T]he [disabled], like others, have and retain their substantive constitutional rights in addition to the right to be treated equally by the law."). *Every* person has a right to be free from government classifications based on arbitrary or irrational criteria, and Congress's power is not limited to "the protection of those classes found by the Court to deserve "special protection' under the Constitution.' " *Clark,* 123 F.3d at 1270-71. *But cf. Wilson-Jones v. Caviness,* 99 F.3d 203, 210 (6th Cir.1996) (stating that the court will not "regard" a legislation that does not affect a judicially-recognized "specially protected" class, as an enactment "to enforce the Equal Protection Clause" unless Congress explicitly stated that it is enforcing that clause), *amended on other grounds,* 107 F.3d 358 (1997).

Additionally, Congress has not exceeded its authority to enforce the Equal Protection Clause simply because the ADEA may impose liability involving distinctions based on age that a court would not find to be "irrational" under that clause. It is undisputed that Congress's power to enforce the rights to equal protection of the law under Section 5 is not unlimited. Congress cannot "decree the substance of the Fourteenth Amendment's restrictions on the States[,]" or alter "what the right[s][are]." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2164, 138 L.Ed.2d at 638. It has long been established, however, that "[l]egislation which deters and remedies constitutional violations can fall within the sweep of Congress' enforcement power *even if in the process it prohibits conduct which is not itself unconstitutional* and intrudes into "legislative spheres of autonomy previously reserved to the States.' " *Boerne,* --- U.S. at ----, 117 S.Ct. at 2163, 138 L.Ed.2d at 637 (quoting *Fitzpatrick,* 427 U.S. at 455, 96 S.Ct. at 2670) (emphasis added). The *Boerne* Court cited, as an example, its

_____

related to a legitimate government interest. *See Gregory,* 501 U.S. at 470-71, 111 S.Ct. at 2405-06.

upholding the suspension of various voting requirements, such as literacy tests, under Congress's parallel power to enforce the Fifteenth Amendment to combat racial discrimination in voting "despite the facial constitutionality of the tests under *Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959)." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2163, 138 L.Ed.2d at 637; *see also Scott v. City of Anniston,* 597 F.2d 897, 899, 900 (5th Cir.1979) ("The fourteenth amendment empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment[,]" as long as Congress does so "to carry out the purpose of [the] amendment[ ]."), *cert. denied,* 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980). Courts must accord Congress "wide latitude" in determining where to draw the line between measures that prevent or remedy unconstitutional actions and those that make substantive changes in the governing law. *Boerne,* --- U.S. at ----, 117 S.Ct. at 2163, 138 L.Ed.2d at 638.

Thus, it is clear that Congress does not merely have to "rubber stamp" the constitutional violations that the Supreme Court has already found to exist; nor does it have to legislate to remedy only that conduct that the Court would find unconstitutional, even though the Court has not yet so ruled. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (stating in dicta that the rational-basis inquiry "reflect[s] the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one").[9] Such an interpretation would essentially render meaningless Congress's power to enforce

---

[9]At issue in *Murgia* was the constitutionality under the Equal Protection Clause of a state statute mandating a retirement age for state police officers. *See* 427 U.S. at 308, 96 S.Ct. at 2563.

the Fourteenth Amendment, which is separate and distinct from the power of the judiciary to interpret the Constitution. *See Katzenbach,* 384 U.S. at 648-49, 86 S.Ct. at 1721-22.

In *Katzenbach v. Morgan,* the Supreme Court rejected the state's argument that section 4(e) of the Voting Rights Act could not be sustained as appropriate legislation to enforce the Equal Protection Clause unless the courts decided that the clause forbade that section's English literacy requirement. 384 U.S. at 648-50, 86 S.Ct. at 1721-22. The Court stated:

> A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the [Fourteenth] Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment. It would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the "majestic generalities" of § 1 of the Amendment.

*Katzenbach,* 384 U.S. at 648-49, 86 S.Ct. at 1721-22 (footnote omitted). I decline to read such a limitation of Congress's power into the *Boerne* decision, and find any assertion that the ADEA may not reach practices that are not themselves unconstitutional simply to be wrong.

*2. The ADEA is an appropriate, proportional remedial measure to address age discrimination.*

In order for the courts to consider legislation to be "remedial," and not substantive, in nature, "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" must exist. *Boerne,* --- U.S. at ----, 117 S.Ct. at 2164, 138 L.Ed.2d at 638. After reviewing the text and legislative history of the ADEA and its amendments, I conclude that Congress, in addressing arbitrary age discrimination in employment, satisfied this requirement. *See generally Wyoming,* 460 U.S. at 229-33, 103 S.Ct. at 1056-58 (discussing the ADEA's legislative history); *Elrod,* 674 F.2d at 604-07 (same).

23

The preamble to the ADEA provides Congress's findings regarding, among other things, "arbitrary age limits regardless of potential for job performance [that] has become a common practice," and "arbitrary discrimination in employment because of age," and states that one of the Act's purposes is to prohibit such discrimination. 29 U.S.C. § 621 (1994). In the 1950s, Congress began its endeavors to prohibit arbitrary age discrimination. *See Wyoming,* 460 U.S. at 229, 103 S.Ct. at 1056. During floor debates concerning the enactment of Title VII of the Civil Rights Act of 1964, amendments to include age along with Title VII's protected classes were rejected "in part on the basis that Congress did not yet have enough information to make a considered judgment about the nature of age discrimination[.]" *Wyoming,* 460 U.S. at 229, 103 S.Ct. at 1056 (citing 110 Cong. Rec. 2596-99, 9911-13, 13490-92 (1964)). Congress thus directed the Secretary of Labor (Secretary) to conduct a "full and complete" study on age discrimination in employment. *Wyoming,* 460 U.S. at 230, 103 S.Ct. at 1057. The Secretary issued the report about a year later, finding, among other things, that (1) employment age discrimination was generally based on unsupported stereotypes and was often defended on pretextual grounds; and (2) the empirical evidence showed that arbitrary age limits were unfounded overall, as older workers, on average, performed as well as younger workers. *Wyoming,* 460 U.S. at 230-31, 103 S.Ct. at 1057-58. Thereafter, committees in the Senate and the House of Representatives conducted extensive hearings on proposed legislation prohibiting such discrimination, and the Secretary's findings "were confirmed throughout the extensive factfinding undertaken by the Executive Branch and Congress." *Wyoming,* 460 U.S. at 230-31, 103 S.Ct. at 1057-58.

In March 1972, around the same time that Congress considered and passed amendments under Section 5 extending Title VII's application to state and local government employees, Senator

Bentsen first introduced legislation to extend the ADEA to government employees. *Elrod,* 674 F.2d at 604 (citing 118 Cong. Rec. 7745 (1972), and Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261, 86 Stat. 103). After Senator Bentsen again presented the proposed amendment in May 1972, arguing that Title VII's underlying principles were "directly applicable" to the ADEA, the Senate voted unanimously in favor of the ADEA amendment. *Elrod,* 674 F.2d at 604-05 (citing 118 Cong. Rec. 15894, 15895 (1972)). The amendment, however, initially failed to pass House-Senate conference committees. *Elrod,* 674 F.2d at 605. Although little legislative history exists concerning the 1974 amendment to the ADEA, and Congress made no mention of a specific constitutional provision, both the House and the Senate cited President Nixon's remarks in 1972 to indicate the congressional purpose of the amendment:

> Discrimination based on age—what some people call "age-ism"—can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the Nation[ ] the contribution they could make if they were working.

*Elrod,* 674 F.2d at 605 (quoting S.Rep. No. 93-690, 93d Cong., 2d Sess. 55 (1974), and H.R.Rep. No. 93-913, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.C.C.A.N. 2811, 2849).[10] In addition,

---

[10]The amendments to the FLSA that, among other things, extended that statute to federal, state and local government employees—and with which Congress passed the 1974 ADEA amendment—overshadowed the ADEA. The House and Senate considered the ADEA amendment to be "a logical extension of the Committee's decision to extend FLSA coverage to Federal, State, and local government employees." *Elrod,* 674 F.2d at 605 (internal quotation marks omitted). Even in light of this and the Supreme Court's concluding that Congress passed the ADEA pursuant to its power under the Commerce Clause, my determination that Congress also was exercising its power under Section 5 of the Fourteenth Amendment in enacting the ADEA is not precluded. *See Wyoming,* 460 U.S. at 243, 103 S.Ct. at 1064 ("The extension of the ADEA to cover state and local governments, both on its face and as applied in this case, was a valid exercise of Congress' powers under the Commerce Clause. We need not decide whether it could *also* be upheld as an exercise of Congress' powers under § 5 of the Fourteenth

Senator Bentsen commented that "[t]he passage of [the ADEA amendment] insures that Government employees will be subject to the same protections against arbitrary employment [discrimination] based on age as are employees in the private sector." *Elrod,* 674 F.2d at 605 (quoting 120 Cong. Rec. 8768 (1974)).[11]

In light of the above, I conclude that the ADEA qualifies as a valid enforcement provision under Congress's Section 5 power. The text and history of the ADEA demonstrate a congressional focus, including extensive factfinding on arbitrary age discrimination, and its resulting harm, in the employment practices of private and public employers—discrimination that had become a "common practice" and was often unrelated to legitimate employment goals. *See* 29 U.S.C. § 621 (1994). "[I]t is clear that the purpose of the [1974 amendment to the ADEA] was to prohibit arbitrary, discriminatory government conduct that is the very essence of the guarantee of "equal protection of the laws' of the Fourteenth Amendment." *Elrod,* 674 F.2d at 604; *see also Ramirez,* 715 F.2d at 699 (stating that Congress extended ADEA coverage "to shield public employees from the invidious effects of age-based discrimination. The 1974 amendment, like the ADEA itself, "is aimed at irrational, unjustified employment decisions based upon assumptions about the relationship between

---

Amendment.") (emphasis added); *Hurd,* 109 F.3d at 1546 (concluding, after *Wyoming,* that "Congress acted pursuant to its powers under the Fourteenth Amendment when it applied the ADEA to the states"); *Ramirez,* 715 F.2d at 700 (holding post*Wyoming* that Congress adopted the 1974 ADEA amendment pursuant to its Section 5 power).

[11]In addition, included in the legislative history of the 1978 ADEA amendments is a statement from Representative Paul Findley further supporting the view that Congress's legislation in the ADEA was part of its general policy to ensure equal employment opportunities. Representative Findley stated that "depriving older and still capable Americans of jobs [does not] make any more sense than discriminating in employment against blacks, women, or religious or ethnic minorities." *Elrod,* 674 F.2d at 606 (quoting H.R.Rep. No. 95-527, Part I, 95th Cong., 1st Sess., *reprinted in* [1978] 753 Gov't Empl. Rel. Rep. (BNA) 101, 103).

age and ability which classify older workers as incapable of effective job performance.' ") (quoting *Elrod,* 674 F.2d at 605).[12]

*B. The ADA*

With respect to the ADA, Judge Cox states that the statute is not valid enforcement legislation for the same reasons that he rejected the ADEA. First, he asserts that because the disabled are not a suspect or quasi-suspect class, and thus enjoy no special rights under the Equal Protection Clause, the ADA provides them with greater protection than does the Equal Protection Clause. His second reason is that the ADA "was unaccompanied by any finding that widespread violation of the disabled's constitutional rights required the creation of prophylactic remedies[,]" and states that "[a]ltruistic and economic concerns motivated [the ADA]—not defense of the Constitution." Cox, J., at 2417-18. For reasons similar to my analysis of the ADEA, I disagree.

As an initial matter, I acknowledge that, unlike in the ADEA, Congress explicitly invoked its enforcement power under the Fourteenth Amendment in the ADA. *See* 42 U.S.C. § 12101(b)(4) (1994) ("It is the purpose of [the ADA] ... to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."). I emphasize, however, that, similar to Congress's expression of its intent, Congress is not required to use any magic words

---

[12]The fact that employers can defend their age-based classifications on the grounds that such classifications are related to a "bona fide occupational qualification reasonably necessary to the normal operation of the particular business" or are "based on reasonable factors other than age," supports the proposition that the ADEA only targets arbitrary age discrimination, rather than every employment decision that is based on or related to age. 29 U.S.C. § 623(f)(1) (1994). Even age-based employment distinctions under disparate impact claims generally do not violate the ADEA if the distinctions serve the "legitimate employment goals of the employer." MacPherson v. University of Montevallo, 922 F.2d 766, 771 (11th Cir.1991) (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 659, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989)).

to invoke its authority to enforce the Fourteenth Amendment under Section 5 before abrogating the states' immunity. *See supra* pp. 2393-94; *see also Clark,* 123 F.3d at 1271 ("Although "the constitutionality of action taken by Congress does not depend on recitals of power which it undertakes to exercise,' we give great deference to congressional statements.") (quoting *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948)). In *EEOC v. Wyoming,* the Supreme Court rejected that very suggestion, and stated:

> It is in the nature of our review of congressional legislation defended on the basis of Congress' powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection," *see, e.g., Fullilove v. Klutznick,* 448 U.S. 448, 476-78, 100 S.Ct. 2758, 2773-74, 65 L.Ed.2d 902 (1980) (Burger, C.J.), for "[t]he ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W Miller Co,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948).

460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n. 18. The question, therefore, is not whether Congress explicitly relied on the Fourteenth Amendment when it enacted the ADA, but whether the statute is within Congress's authority under that amendment. *See Ramirez,* 715 F.2d at 698 ("The omission of any ritualistic incantation of powers by the Congress is not determinative, for there is no requirement that the statute incorporate buzz words ..."); *Elrod,* 674 F.2d at 608 ("[T]he test of whether legislation is enacted pursuant to § 5 of the Fourteenth Amendment requires no talismanic intoning of the amendment. Rather, the inquiry is whether the *objectives* of the legislation are within Congress' power under the amendment.") (internal citation and footnote omitted). That being said, I now turn to the substantive analysis of the ADA.

First, I do not agree with Judge Cox's equal protection argument concerning the ADA for the same reasons I declined to accept this argument with respect to the ADEA. Although, like older

individuals, the disabled are not a suspect or quasi-suspect class—and therefore are not entitled to the higher level of judicial scrutiny under the Equal Protection Clause that courts accord state action affecting such classes—the disabled are still entitled to the equal protection of the law against arbitrary discrimination, as is every person. *See Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3257 ("Our refusal to recognize the [disabled] as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination."). Like the Ninth Circuit, I find no authority for the idea that "the Court's choice of a level of scrutiny for purposes of judicial review should be the boundary of the legislative power under the Fourteenth Amendment[.]" *Clark,* 123 F.3d at 1271. I therefore conclude—especially in light of the congressional history of the ADA as discussed below—that Congress did not exceed its authority in enacting that statute simply because the ADA may impose liability in situations that the courts would not find to violate judicial standards under the Equal Protection Clause. I consider the ADA to be legislation that falls within the sweep of Congress' enforcement power to "prohibit[ ] conduct which is not itself unconstitutional." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2163, 138 L.Ed.2d at 637.

Additionally, I disagree with the assertion that Congress was not concerned with constitutional violations when it enacted the ADA, and thus that the statute is not valid enforcement legislation under its Section 5 power. The ADA is "appropriate legislation" to enforce the Equal Protection Clause, as it may be regarded as an enactment to enforce that clause, is plainly adapted to that end and "is not prohibited by but is consistent with the letter and spirit of the [C]onstitution." *Clark,* 123 F.3d at 1270 (internal quotation marks omitted); *see also Autio v. AFSCME, Local 3139,* --- F.3d ----, No. 97-3145 (8th Cir. Apr.9, 1998) (concluding that Congress validly enacted the ADA to enforce the Equal Protection Clause through the exercise of its Section 5 power); *Coolbaugh,* 136

29

F.3d at 438 ("[T]he ADA represents Congress' considered efforts to remedy and prevent what it perceived as serious, widespread discrimination against the disabled.").

Congress considered an abundance of evidence and made extensive findings in the ADA concerning the extent of the discrimination against, and resulting harm to, the disabled to support the statute's enactment. *See Coolbaugh,* 136 F.3d at 436-37 (stating that both the House and the Senate cited seven substantive studies or reports and "a wealth of testimonial and anecdotal evidence from a spectrum of parties to support the finding of serious and pervasive discrimination"). In particular, it found that:

> (1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;
>
> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;
>
> (4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;
>
> (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; [and]
>
> (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally[.]

42 U.S.C. § 12101(a) (1994); *Coolbaugh,* 136 F.3d at 435. Congress also observed that:

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;

(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;  and

(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

42 U.S.C. § 12101(a) (1994);  *Coolbaugh,* 136 F.3d at 435 n. 3.[13] As the Supreme Court has stated, "It is for Congress in the first instance to "determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2171, 138 L.Ed.2d at 649 (quoting *Katzenbach,* 384 U.S. at 651, 86 S.Ct. at 1723) (alteration in original);  *Coolbaugh,* 136 F.3d at 436 ("Deference to the judgment of Congress is particularly appropriate in this case, because in *Cleburne,* the Court identified Congress as the ideal governmental branch to make findings and decisions regarding the legal treatment of the disabled.") (citing 473 U.S. at 442-43, 105 S.Ct. at 3255-56);  *Cleburne,* 473 U.S. at 442-43, 105 S.Ct. at 3255-56 ("How this large and diversified group is to be treated under

---

[13]Congress's detailed findings in the ADA are one ground on which to distinguish the underlying *Dickson* case from *Boerne,* in which the Court noted that Congress made no findings concerning widespread unconstitutional discrimination against religious persons to support the RFRA. *See Boerne,* --- U.S. at ---- - ----, 117 S.Ct. at 2169-70, 138 L.Ed.2d at 645-46;  *see also Coolbaugh,* 136 F.3d at 438.  The Court, however, went on to state that "[j]udicial deference, in most cases, is based not on the state of the legislative record Congress compiles but "on due regard for the decision of the body constitutionally appointed to decide.' " *Boerne,* --- U.S. at ----, 117 S.Ct. at 2170, 138 L.Ed.2d at 646 (quoting *Oregon v. Mitchell,* 400 U.S. 112, 207, 91 S.Ct. 260, 306, 27 L.Ed.2d 272 (1970) (Harlan, J.)).

the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary."). In light of these explicit congressional findings, I find it abundantly clear that Congress was concerned about the "defense of the Constitution" in enacting the ADA.

Overall, viewing the remedial measures in light of the evils presented, both the ADEA and the ADA were valid enactments of Congress to redress discrimination pursuant to its enforcement power under Section 5 of the Fourteenth Amendment. Additionally, because the dangers that the Court found inherent in the RFRA are not present in the ADEA and the ADA, I find *Boerne* distinguishable. *Boerne,* --- U.S. at ----, 117 S.Ct. at 2170, 138 L.Ed.2d at 647 (stating that "[t]he reach and scope of [the] RFRA distinguish it from other measures passed under Congress' enforcement power...."). First, the ADEA and the ADA did not pose the same threat as the RFRA to the separation of powers principles, because "Congress included no language attempting to upset the balance of powers and usurp the Court's function of establishing a standard of review by establishing a standard different from the one previously established by the Supreme Court." *Coolbaugh,* 136 F.3d at 438.[14] Second, unlike the ADEA and the ADA, the RFRA "prohibit[ed] official actions of almost every description and regardless of subject matter." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2170, 138 L.Ed.2d at 646. Neither the ADEA nor the ADA "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Boerne,* --- U.S. at ----, 117 S.Ct. at 2170, 138 L.Ed.2d at 646; *see also Coolbaugh,* 136 F.3d at 437 ("Congress' scheme in the ADA to provide

---

[14]Although the *Coolbaugh* court was specifically referring to the ADA, I find the same to be true of the ADEA.

a remedy to the disabled who suffer discrimination and to prevent such discrimination is not so draconian or overly sweeping to be considered disproportionate to the serious threat of discrimination Congress perceived."); *Clark,* 123 F.3d at 1270. Finally, the standard of review set forth in the RFRA was "the most demanding test known to constitutional law[,]" and imposed an additional requirement on state action that the previous judicial standard that Congress attempted to reinstate, *i.e.,* that the state action be the least restrictive means of fulfilling the state's interest, had not imposed. *See Boerne,* --- U.S. at ----, 117 S.Ct. at 2171, 138 L.Ed.2d at 648. The same simply cannot be said for analysis of claims under the ADEA and ADA.

In general,

[t]he extension of the ADEA [and the ADA] to the states insures uniformity and greater compliance with [those statutes]. It also eliminates the anomaly that government is not bound by public policy. As Justice Brennan remarked in a related context: "How "uniquely amiss' it would be, therefore, if the government itself—"the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct'—were permitted to disavow liability for the injury it has begotten."

*Elrod,* 674 F.2d at 612 (quoting *Owen v. City of Independence,* 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980)).

### III. CONCLUSION

For the foregoing reasons, I would hold that Congress effectively abrogated the states' sovereign immunity in enacting the ADEA as well as the ADA. Therefore, I would affirm the district courts' decisions in *Kimel* and *Dickson,* and would reverse the district court's decision in *MacPherson.* Accordingly, I concur only in the judgment of Part II of Judge Edmondson's opinion and otherwise respectfully dissent.

COX, Circuit Judge, concurring in part and dissenting in part:

Congress lacks the constitutional authority to abrogate the states' Eleventh Amendment immunity to suit in federal court on claims under either the Age Discrimination in Employment Act or the Americans with Disabilities Act. For that reason, I concur in Judge Edmondson's conclusion that the states are immune to ADEA suits. I respectfully dissent, however, from the holding that the states do not enjoy the same immunity from ADA suits.

## I. Background

Each of the plaintiffs in these three consolidated appeals sued a state instrumentality, asserting claims under the ADEA or ADA. In each case, the state raised a defense of Eleventh Amendment immunity to suit on such claims. In *MacPherson v. University of Montevallo,* the district court granted the University's motion to dismiss, concluding that Congress has not, by enacting the ADEA, abrogated the states' Eleventh Amendment immunity. The district court hearing *Kimel v. Florida Board of Regents,* on the other hand, denied a similar motion by the Florida Board of Regents. And the Florida Department of Corrections likewise unsuccessfully sought dismissal of ADA and ADEA claims against it in *Dickson v. Florida Department of Corrections.*

McPherson and the state entities in *Dickson* and *Kimel* have appealed the respective rulings. The appeals present two related issues: has Congress abrogated the states' Eleventh Amendment immunity to suits under (1) the ADEA or (2) the ADA? This court's review of such issues of law is de novo. *See Seminole Tribe v. Florida,* 11 F.3d 1016, 1021 (11th Cir.1994), *aff'd,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

## II. Discussion

### A. *Abrogation*

34

The judicial power of the United States does not extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of that or another state. *See* U.S. Const. amend. XI; *Hans v. Louisiana,* 134 U.S. 1, 14-15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890). Congress may abrogate the states' immunity if first it "unequivocally expresse[s] its intent to abrogate the immunity," and second it acts "pursuant to a valid exercise of power." *See Seminole Tribe v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996) (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)).

Congress has provided a clear statement of intent to abrogate in the ADA. The Act provides that "[a] State shall not be immune under the eleventh amendment...." 42 U.S.C. § 12202. As Judge Edmondson points out, the ADEA presents a harder question. On one hand, Congress identified state employees as potential plaintiffs and the states as potential defendants. On the other hand, Congress never uses the words "Eleventh Amendment" or "immunity." *See* [Judge Edmondson's Opinion at 2393-99]. Notwithstanding the omission of these words, the explicit designation of states as potential defendants has led four circuit courts to conclude that Congress did clearly intend to abrogate the states' immunity to ADEA suits. *Hurd v. Pittsburg State Univ.,* 109 F.3d 1540, 1544 (10th Cir.1997); *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 695 (3d Cir.1996) (dictum); *Davidson v. Board of Governors of State Colleges & Univs.,* 920 F.2d 441, 443 (7th Cir.1990); *Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 698 (1st Cir.1983). The Supreme Court has agreed with this reasoning in other contexts. *See Seminole Tribe,* 517 U.S. at 56, 116 S.Ct. at 1124 (Indian Gaming Act's designation of states as parties sufficient); *Dellmuth v. Muth,* 491 U.S. 223, 233, 109 S.Ct. 2397, 2403, 105 L.Ed.2d 181 (1989) (Scalia, J., concurring) ("I join the opinion of [four other Justices of] the Court, with the understanding that its reasoning does not preclude congressional

35

elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment."); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976) (Title VII's designation of states as parties enough).

Fortunately, the thorny issue of Congress's intent need not be resolved here. Whether or not Congress clearly expressed its intent, it lacks the power to abrogate the states' immunity to suit in federal court in actions under the ADEA or the ADA. The Supreme Court has identified only one constitutional grant of power, § 5 of the Fourteenth Amendment, under which Congress may defeat the states' immunity. *See Seminole Tribe,* 517 U.S. at 58-59, 116 S.Ct. at 1125-28. The Court has recently revisited the limits on that power.

B. *Power to Abrogate:* City of Boerne v. Flores

In *City of Boerne v. Flores,* --- U.S. ----, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court struck down the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb to 2000bb-4. The RFRA prohibited all governmental entities from "substantially burdening" the exercise of religion unless they had a compelling interest for doing so and had employed the "least restrictive means" for furthering that interest. *Id.* § 2000bb-1(a), (b). With the RFRA's stringent rule, Congress sought to resurrect the First and Fourteenth Amendment rights that Congress believed the Supreme Court had extinguished in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). A Roman Catholic church in Boerne, Texas, invoked the Act when the town denied the church a permit to add additional worship space. *Boerne,* --- U.S. at ----, 117 S.Ct. at 2160. The district court held that the RFRA was beyond Congress's Fourteenth Amendment powers, and the Supreme Court agreed.

The Court rested this conclusion on a basic principle: The Court is the unique, ultimate authority on the scope of Fourteenth Amendment rights. *See id.* at ----, 117 S.Ct. at 2166. Thus, Congress may not define or declare these rights. *See id.* Rather, Congress may only enforce the Fourteenth Amendment rights the Supreme Court has recognized. *See id.* at ----, 117 S.Ct. at 2164. Enforcement can include creating some rights beyond those clearly guaranteed by the Constitution. *See id.* at ----, 117 S.Ct. at 2163. But, the Court concluded, such extensions of rights must be proportional to an unconstitutional injury that Congress is seeking to remedy. *See id.* at ----, 117 S.Ct. at 2164.

The RFRA was not such a proportional response to any injury to constitutional rights. The Court identified two circumstances that showed the RFRA to be "substantive" legislation, as the Court called it, rather than enforcement of Fourteenth Amendment guarantees. First, Congress enacted the RFRA without findings (or even hearings) on the existence of widespread violations of any constitutional right that the Supreme Court has recognized. *Id.* at ----, 117 S.Ct. at 2169. Second, rather than simply remedying any constitutional violations, the RFRA created rights that far exceeded any the Supreme Court has read the First Amendment to provide. *See id.* at ----, 117 S.Ct. at 2170. Under *Smith,* generally applicable statutes that incidentally burden religion are permissible, *see* 494 U.S. at 878-79, 110 S.Ct. at 1600; the RFRA could not be *enforcing* any First and Fourteenth Amendment right to be free from incidental burdens on religious practice. *See Boerne,* --- U.S. at ----, 117 S.Ct. at 2171. Therefore, Congress did not have power under the Fourteenth Amendment to enact the statute.

*Boerne* thus sets the RFRA outside § 5's boundary. Two earlier cases, both concerning the Voting Rights Act of 1965, exemplify proper exercise of Congress's § 5 power. The first case is

37

*South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), which rejected a broad attack on most of the geographically restricted provisions of the Voting Rights Act. The second is *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), which upheld a provision of the Act that invalidated New York's English-literacy voter-qualification rule. Of the two cases, *Morgan* appears to attribute the broadest powers to Congress, arguably recognizing a congressional power not only to effectuate Supreme Court-identified rights but also to find Fourteenth Amendment rights not yet identified by the Supreme Court. *See Morgan,* 384 U.S. at 650-51, 86 S.Ct. at 1723-24.

The *Boerne* Court dismissed the language in *Morgan* that suggests that Congress has broad powers both to interpret the Fourteenth Amendment and effectuate Fourteenth Amendment rights, *Boerne,* --- U.S. at ----, 117 S.Ct. at 2168, but the Court reaffirmed its holdings in these Voting Rights Act cases. *Id.* at ---- - ----, 117 S.Ct. at 2166-68. The differences between the circumstances underlying the Voting Rights Act and those leading to the RFRA are, after all, striking. Before passing the Voting Rights Act, Congress thoroughly documented a history of obvious Fifteenth Amendment violations, and the legislative history indicates that the Act's primary purpose was to vindicate the Fifteenth Amendment rights that Southern voting laws and practices were defeating. *Morgan,* 384 U.S. at 648, 86 S.Ct. at 1722; *South Carolina,* 383 U.S. at 313, 328, 86 S.Ct. at 811, 818-19. Congress took measures tailored to remedy the constitutional violations: the measures were limited to prohibiting patently unconstitutional conduct and establishing policing mechanisms for future violations; they applied only to states where Congress found constitutional violations were the most common; and the Act contained "bailout" provisions to relieve jurisdictions that complied

38

with the Constitution from the Act's restraints. *See Boerne,* --- U.S. at ----, 117 S.Ct. at 2170. The Voting Rights Act effectuated established constitutional guarantees.

*Boerne* and the Voting Rights Act cases teach us these lessons: Only by respecting Supreme Court interpretations of the Fourteenth Amendment can Congress avoid impermissibly interpreting the Amendment itself. *See Boerne,* --- U.S. at ---- - ----, 117 S.Ct. at 2166-67. Congress nonetheless may, if circumstances warrant, tweak procedures, find certain facts to be presumptively true, and deem certain conduct presumptively unconstitutional in light of Supreme Court interpretation. *See South Carolina,* 383 U.S. at 328, 333, 335, 86 S.Ct. at 818, 821-22. Thus, legislation enacted pursuant to § 5 must hew to the contours of Supreme Court-defined Fourteenth Amendment rights *unless* the legislation is a proportional response to a documented pattern of constitutional violation.

### C. *Is the ADEA Enforcement Legislation?*

The ADEA does not qualify under *Boerne* 's rule as a proper exercise of Congress's § 5 power.[1] First, the ADEA confers rights far more extensive than those the Fourteenth Amendment provides. Second, Congress did not enact the ADEA as a proportional response to any widespread violation of the elderly's constitutional rights.

The Fourteenth Amendment right that the ADEA arguably guards is that of equal protection. The Equal Protection Clause generally prohibits states from treating similarly situated citizens

---

[1]There is pre-*Boerne* law in other circuits finding the exercise to be proper. *See Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 699 (1st Cir.1983); *E.E.O.C. v. Elrod,* 674 F.2d 601, 605 (7th Cir.1982); *Arritt v. Grisell,* 567 F.2d 1267, 1271 (4th Cir.1977). They share a similar analysis, which has two flaws. First, it rests on broad language in *Katzenbach v. Morgan,* 384 U.S. at 650-51, 86 S.Ct. at 1723-24, that *Boerne* has since rejected, --- U.S. at ----, 117 S.Ct. at 2168. Second, it treats all "discrimination" as equally impermissible under the Equal Protection Clause and therefore within Congress's power to remedy. That is simply not true. Race and age discrimination, for example, are subject to very different degrees of scrutiny.

differently. *See Romer v. Evans,* 517 U.S. 620, 621, 116 S.Ct. 1620, 1623, 134 L.Ed.2d 855 (1996). But the degree of protection varies according to the class of person discriminated against or the interest that the classification compromises. *See City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 440-42, 105 S.Ct. 3249, 3254-55, 87 L.Ed.2d 313 (1985). State action that confers different rights, or imposes different duties, on persons belonging to nonsuspect classes is permissible if the action has a rational relation to a legitimate governmental interest. *See Romer,* 517 U.S. at 630, 116 S.Ct. at 1627.

The elderly are not a suspect class, and state action that disadvantages them is constitutional if it passes this rational basis test. *See Gregory v. Ashcroft,* 501 U.S. 452, 470, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313-14, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). Under this test, the Supreme Court will not overturn a state measure "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [people's] actions were irrational." *Gregory,* 501 U.S. at 471, 111 S.Ct. at 2406 (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942-43, 59 L.Ed.2d 171 (1979)) (alterations in original). And a state does not violate the Equal Protection Clause "merely because the classifications made by the laws are imperfect." *Id.* at 473, 111 S.Ct. at 2407 (quoting *Murgia,* 427 U.S. at 316, 96 S.Ct. at 2568). Moreover, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance,* 440 U.S. at 111, 99 S.Ct. at 949.

The Supreme Court has put three mandatory retirement age policies to this test, and all have passed. *Gregory,* 501 U.S. at 452, 111 S.Ct. at 2395 (policy required judges to retire at 70); *Vance,*

40

440 U.S. at 93, 99 S.Ct. at 939 (policy required foreign service officers to retire at 60); *Murgia,* 427 U.S. at 307, 96 S.Ct. at 2562 (policy required police officers to retire at 50). In each case, the policymaker's perception that mental acuity and physical stamina decline with age was rational basis enough to support the line between those under the retirement age and those over it. *Gregory,* 501 U.S. at 472, 111 S.Ct. at 2407; *Vance,* 440 U.S. at 98-109, 99 S.Ct. at 943-49; *Murgia,* 427 U.S. at 315-16, 96 S.Ct. at 2567-68. Thus, it is clear that the Supreme Court does not deem *all* arbitrary treatment offensive to the Fourteenth Amendment. To a spry octogenarian, of course, a mandatory retirement age is arbitrary: it does not permit an assessment of his or her individual capacities. To violate the Equal Protection Clause, however, the *arbitrary line itself* must have no rational basis. *See Gregory,* 501 U.S. at 472, 111 S.Ct. at 2407. In short, the Equal Protection Clause permits state action—if it has a rational basis—that may look like arbitrariness.

By contrast, the ADEA was enacted to combat *all* arbitrariness, unconstitutional or not. Its legislative history shows that Congress particularly deplored, and wished to ban, arbitrary age limits that overlooked some individuals' abilities. *See E.E.O.C. v. Wyoming,* 460 U.S. 226, 231, 103 S.Ct. 1054, 1057-58, 75 L.Ed.2d 18 (1983); *see also* 29 U.S.C. § 621(a)(2) (statement of findings and purpose) ("the setting of arbitrary age limits regardless of potential for job performance has become a common practice"). Not surprisingly, the Supreme Court has read the ADEA to prohibit arbitrary line-drawing—even line-drawing that has a rational basis. "It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). "Thus the ADEA commands that "employers are to evaluate [older] employees ... on their merits and not their age.' ... The employer cannot rely on age as a proxy for

41

an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly." *Id.* at 611, 113 S.Ct. at 1706 (quoting *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 422, 105 S.Ct. 2743, 2756, 86 L.Ed.2d 321 (1985)).

The ADEA accordingly puts mandatory retirement ages to a much more rigorous test than the Equal Protection Clause. A rational basis does not suffice. *Criswell,* 472 U.S. at 421, 105 S.Ct. at 2755. Rather, "[u]nless an employer can establish a substantial basis for believing that all or nearly all employees above an age lack the qualifications required for the position, the age selected for mandatory retirement less than 70 must be an age at which it is highly impractical for the employer to [e]nsure by individual testing that its employees will have the necessary qualifications for the job." *Id.* at 422-23, 105 S.Ct. at 2756; *see also Arritt v. Grisell,* 567 F.2d 1267, 1271 (4th Cir.1977) (finding a mandatory maximum hiring age violative of ADEA, but not of the Equal Protection Clause).

Mandatory age limits are not the only illustration of the gulf between the elderly's rights under the Equal Protection Clause and the elderly's rights under the ADEA. State action that has a disparate impact on old workers probably does not violate the Equal Protection Clause, but it can violate the ADEA. *Compare Washington v. Davis,* 426 U.S. 229, 239-40, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976) (rejecting a disparate-impact theory of violation of the Equal Protection Clause even for suspect classifications), *with MacPherson v. University of Montevallo,* 922 F.2d 766, 770-73 (11th Cir.1991) (recognizing a disparate-impact claim theory under the ADEA). Some courts have held that the ADEA so far overshadows equal protection rights that the ADEA has completely displaced 18 U.S.C. § 1983 as a vehicle for an age discrimination claim. *See Lafleur v. Texas Dep't of Health,* 126 F.3d 758, 760 (5th Cir.1997); *Zombro v. Baltimore City Police Dep't,*

868 F.2d 1364, 1366-67 (4th Cir.1989). Even where such a § 1983 claim is recognized, the Fourteenth Amendment has been held to permit demotion of a worker for the proffered rational reason that new, young, and attractive faces were needed in her stead—practically a paradigmatic ADEA violation. *See Izquierdo Prieto v. Mercado Rosa,* 894 F.2d 467, 469, 472 (1st Cir.1990). And one court has gone so far as to question the existence of *any* constitutional right against age-motivated individual employment actions. *See Whitacre v. Davey,* 890 F.2d 1168, 1169 n. 3 (D.C.Cir.1989).

As one might expect after considering these differences, Congress's reasons for amending the ADEA to subject states to its restraints did not lie in concern for the Constitution. The reports accompanying the 1974 amendments do not mention the Constitution at all. *See* H.R.Rep. No. 93-913 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2811, 2849-50. Congressional debate over the amendments, which were included in the Fair Labor Standards Act of 1974, was silent on constitutional violations. *See* 120 Cong. Rec. 7306-49, 8759-69 (1974). The supporters simply thought it was a good idea, not that it furthered enforcement of constitutional rights. *See* 1974 U.S.C.C.A.N. at 2849 ("Discrimination based on age—what some people call "age-ism'—can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group.") (quoting Richard M. Nixon Address (March 23, 1972)).

In sum, the ADEA has created a new class of rights, but not in response to any threat to constitutional rights. The ADEA thus fails *Boerne*'s standard for enforcement legislation. Because the ADEA is not a valid exercise of Congress's § 5 authority, Congress could not have abrogated the states' Eleventh Amendment immunity to suit.

D. *Is the ADA Enforcement Legislation?*

The ADA is not a valid enforcement statute for the same two reasons the ADEA is not. First, like the aged, the disabled enjoy no special rights under the Equal Protection Clause.[2] The Supreme Court has never found the disabled to be a suspect or even quasi-suspect class. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 445-46, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985) (declining to "set out on [the] course" leading to quasi-suspect status for the disabled and infirm); *see also Heller v. Doe by Doe,* 509 U.S. 312, 321, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993) (confirming this position). State action discriminating against the mentally retarded, a subset of the disabled, is subject to only rational basis review. *City of Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3258. The lower courts have interpreted these holdings to require only rational basis review for all discrimination against the disabled. *See, e.g., Lussier v. Dugger,* 904 F.2d 661, 670-71 (11th Cir.1990). And this review is not searching: "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller,* 509 U.S. at 321, 113 S.Ct. at 2643.

By contrast, the ADA prohibits distinctions built on generalizations—even if rational. It prohibits discrimination for practically any reason that does not reflect a business necessity. *See* 42

---

[2]Here I respectfully part company with Chief Judge Hatchett and the Ninth, Eighth, and Fifth Circuits. I agree in general with those circuits' analyses of the scope of Congress's § 5 power. *See Autio v. AFSCME, Local 3139,* --- F.3d ----, No. 97-3145 (8th Cir. Apr.9, 1998); *Coolbaugh v. Louisiana,* 136 F.3d 430, 432 (5th Cir.1998); *Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.), *pet. for cert. filed,* 66 U.S.L.W. 3308 (1997). The *Clark* court concludes that the ADA lies within Congress's enforcement power because the Constitution prohibits discrimination against disabled people. *See id.* This reasoning does not go far enough; it matters *what kind* of discrimination the Constitution prohibits, and whether the ADA was aimed at that kind of discrimination. The *Coolbaugh* and *Autio* courts make essentially the same mistake. *See Coolbaugh,* 136 F.3d at 441 (Smith, J., dissenting).

U.S.C. § 12112(a); *see also Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1132 (11th Cir.) (listing elements of prima facie ADA claim), *amended on reh'g in other part,* 102 F.3d 1118 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). It requires assessment of each employee's abilities and reasonable accommodation to the point of undue hardship. *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as one who can perform essential functions of job with reasonable accommodation); *id.* § 12112(b)(5)(A) (defining discrimination as failure to make reasonable accommodations, unless accommodation would create undue hardship for the employer); H.R.Rep. No. 101-485, at 58, *reprinted in* 1990 U.S.C.C.A.N. 303, 340 ("[C]overed entities are required to make employment decisions based on facts applicable to individual applicants or employees, and not on the basis of presumptions as to what a class of individuals with disabilities can or cannot do."). Thus, the ADA provides much greater protection for the disabled than does the Equal Protection Clause.

The second reason the ADA is not enforcement legislation is that it was unaccompanied by any finding that widespread violation of the disabled's constitutional rights required the creation of prophylactic remedies. In the legislative history, Congress did not even mention that the ADA was meant to remedy Fourteenth Amendment violations. The committee reports that accompany the Act emphasize the discouraging effect of employment discrimination on the disabled and the costs to society of caring for those who could care for themselves, absent discrimination. *See, e.g.,* H.R.Rep. No. 101-485, at 41-47, *reprinted in* 1990 U.S.C.C.A.N. 303, 323-29. Far from implying that this state of affairs resulted from violations of any constitutional rights, the legislative history and the Act itself show that Congress was dismayed by the *lack* of rights the disabled enjoyed before the Act's passage. *See* 42 U.S.C. § 12101(a)(4) ("[I]ndividuals who have experienced discrimination

on the basis of disability have often had no legal recourse to redress such discrimination[.]"); *see, e.g., id.* at 47-48, 1990 U.S.C.C.A.N. at 329-30. Altruistic and economic concerns motivated this Act—not defense of the Constitution. The laudability of Congress's goals provides no exception to the limits on Congress's Fourteenth Amendment power.

Like the ADEA, the ADA was not enforcement legislation under *Boerne* 's rule. Congress therefore could not abrogate the states' immunity.

### III. Conclusion

For the foregoing reasons, I would: affirm the dismissal in *MacPherson;* and reverse the denials of the motions to dismiss in *Kimel* and *Dickson,* and remand with instructions to dismiss for want of jurisdiction.